# UNITED STATES DISTRICT COURT
for the
Middle District of North Carolina

FILED
in the Middle District of
North Carolina
**January 10, 2023**
**1:02 pm**
Clerk, US District Court
By: _____ kg _____

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Gibran Cabrera | ) | Case No. |
|  | ) | 1:23MJ 16 |
|  | ) | |
|  | ) | |
| Defendant(s) | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **January 9, 2023** in the county of **Forsyth** in the **Middle** District of **North Carolina**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(a)(1)(A), 923(a), 924(a)(1)(D), and 2. | Dealing in firearms without a license. |

This criminal complaint is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

/S/ RUSSELL JOHNSON
*Complainant's signature*

Russell Johnson, Special Agent, ATF
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Criminal Complaint and attached affidavit in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 1/10/2023

*Judge's signature*

City and state: Winston-Salem, North Carolina

Joi E. Peake, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT OF SPECIAL AGENT RUSSELL JOHNSON IN SUPPORT OF APPLICATION FOR ARREST WARRANT

I, Russell Johnson, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, being duly sworn, state as follows:

## AFFIANT'S EXPERIENCE

1. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. As a law enforcement officer, I have used and/or participated in a variety of methods investigating firearms and narcotics related crimes, including, but not limited to, visual surveillance, witness interviews, the use of search warrants, confidential informants, undercover agents, pen registers/trap and trace devices, and mobile tracking devices. Based upon information gained through this investigation and others pertaining to firearm trafficking activities of the participant in this investigation, I am familiar with the ways firearm traffickers conduct their business. My familiarity includes the various means and methods by which firearm traffickers acquire and distribute their firearms, their use of cellular

1

telephones, and their use of vehicles in furtherance of firearms trafficking and money transactions.

## PURPOSE OF AFFIDAVIT

3. This affidavit is made in support of an application for a criminal complaint for Gibran Cabrera.

4. I have probable cause to believe that Cabrera, not then being a licensed dealer within the meaning of Chapter 44, Title 18, United States Code, did willfully engage in the business of dealing in firearms, in violation of Title 18, United States Code, Sections 922(a)(1)(A), 923(a), 924(a)(1)(D), and 2.

## THE INVESTIGATION – FACTUAL BACKGROUND

5. Because this affidavit is being submitted for the limited purpose of establishing probable cause for a criminal complaint, I have not included every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause of violation of a federal criminal offense, specifically 18 U.S.C. §§ 922(a)(1)(A), 923(a), 924(a)(1)(D), and 2.

## PROBABLE CAUSE

6. On October 6, 2022, an ATF Confidential Informant (hereinafter, CI) was debriefed by agents and stated that he/she met an individual later

2

identified as Angel Joel Rivera de Jesus (Rivera). Rivera told the CI that he could sell the CI Percocet pills, methamphetamine, and firearms. Rivera provided his phone number to the CI as XXX-XXX-8207. On October 10, 2022, Rivera sent the CI a photograph that depicted two (2) Glock pistols. Rivera offered the Glock, model 43x for sale, $1,000.00 without accessories or $1,100.00 with accessories. The CI informed Rivera that he/she would purchase one of the firearms.

7. On October 11, 2022, the CI, accompanied by an ATF Special Agent (hereinafter, UC), acting in an undercover capacity, agreed to meet Rivera in the parking lot of McDonald's, located at 110 Hanes Mall Circle, Winston Salem, North Carolina. When the UC and the CI arrived, they exited the undercover vehicle (UCV) and made contact with Rivera, the driver, and an individual later identified as Alex Manuel Colon Correa (Correa), the front passenger. The UC observed Correa holding what appeared to be the same Glock, model 43x handgun that Rivera had earlier offered for sale to the CI. The UC confirmed the price was $1,100.00 and handed the funds to Correa. In return, Correa handed the UC the firearm and a plastic bag, which he stated contained the sights to the firearm. The UC engaged Rivera and Correa in firearms related conversation, and they stated they could

3

obtain/sell machinegun conversion devices (hereinafter, Glock switches), ARs (assault rifles), and ARPs (assault rifle pistols).

8. This transaction was audio/video recorded and the funds used for the purchase were prerecorded.

9. On October 13, 2022, the CI asked Rivera if he had any firearms for sale and Rivera replied, "Bet my boy and I got a Canik rn" ("rn" meaning "right now") that held an 18 round magazine and stated, "I bought a 33-round mag for it." Rivera further stated the firearm had "a flash and beam" (i.e, flashlight and laser attachments) and they wanted $1,000.00 for the firearm without accessories and $1,200.00 for the firearm with the accessories. Rivera also sent photos of the firearm. The CI agreed to purchase the firearm later this same date.

10. Later on this same date the UC and the CI met Rivera and an individual subsequently identified as GIBRAN CABRERA (CABRERA) in the McDonald's parking lot, 110 Hanes Mall Circle, Winston Salem, North Carolina. When the UCV arrived, the UC observed Rivera's vehicle already parked. The UC and the CI exited the UCV and approached the passenger-side of Rivera's vehicle. CABRERA, the front passenger, was observed holding what was believed to be the Canik firearm depicted in the photo sent by Rivera. CABRERA handed the firearm to the UC. The UC then inspected

4

the firearm as he sat in the passenger compartment of the UCV. CABRERA and Rivera both made statements regarding the stock magazine for the firearm having a capacity of 18 rounds and Rivera stated, "that's a blower, you heard." The UC asked CABRERA if he wanted $1,000.00 for the firearm, to which he replied $1,200.00. At this time, the UC observed CABRERA holding two (2) magazines in his hand and observed Rivera brandishing an unidentified firearm.

11. Rivera pointed at one (1) of the magazines that CABRERA was holding and stated it was the 33-round magazine. The UC asked Rivera how much he wanted for the firearm that he was carrying, and Rivera answered $800.00; however, he could not sell it for two (2) weeks. The UC then handed CABRERA the $1,200.00 to complete the purchase of the Canik firearm. The UC told both individuals that he had the money necessary to purchase the firearm Rivera was holding and both Rivera and CABRERA stated that they could not sell it at the moment. The UC asked what kind of firearm it was and CABRERA replied that it was a "ghost," referring to a personally made firearm, also known as a "ghost gun." Rivera asked the UC how he liked the previously purchased Glock, model 43, and the UC confirmed it was nice.

12. The UC again attempted to purchase the "ghost" firearm, which CABRERA declined by stating "right now we can't" and Rivera told the UC to

5

give them two (2) days. The UC asked Rivera and CABRERA if they routinely acquired "ghost guns" because he (the UC) was looking to purchase "ghost guns" and "Glock switches." CABRERA replied, "you like the ghost...bet, I make them." CABRERA pointed at the firearm being held by Rivera and called the firearm a "P80," also known as a Polymer80, which is the manufacturer of the frame. CABRERA acknowledged that he sold "ghost guns" for $800.00. The UC asked CABRERA if the "ghost gun" being held by Rivera was the same size as the Glock, model 43x, and CABRERA stated it was the size of the Glock, model 26, 9mm pistol. CABRERA retrieved the firearm from Rivera, removed the magazine, and retrieved what appeared to be a stock, Glock, model 26 magazine and inserted it into the "ghost gun." The UC asked to inspect the firearm, which CABRERA allowed, and the UC observed the manufacturer of the frame to be "Polymer80."

13. Rivera informed the CI that they were trying to acquire a fully automatic "AR" (assault rifle) and would let the CI know if and when they did. The UC asked CABRERA if a "Glock switch" would fit on the "ghost gun," which CABRERA acknowledged in the affirmative, and stated that he was attempting to acquire a new source of supply for "Glock switches." As the UC and the CI were returning to their vehicle, CABRERA offered to sell the UC a holster for the Canik he had just purchased, which the UC refused.

6

14. This transaction was audio/video recorded and the funds used for the purchase were prerecorded.

15. It should be noted, the Canik firearm was subsequently test-fired and found to be ballistically connected to two (2) previous shots fired calls in Winston Salem, North Carolina.

16. On October 14, 2022, Rivera contacted the CI and attempted to sell a Glock, model 20, 10mm pistol. Rivera originally stated that he wanted $2,000.00 for the firearm and $1,850.00 was the lowest he would go. Rivera stated the firearm was new in the box. The CI informed Rivera that the UC was not willing to pay more than $1,500.00 for the firearm, which Rivera declined. Rivera sent pictures of the firearm to the CI.

17. On this same date, the UC called Rivera and discussed the firearm. The UC reiterated that he would not pay more than $1,500.00 and Rivera lowered his price to $1,800.00; however, the UC informed Rivera that he would pass. The UC asked Rivera if they had acquired the full-auto AR that he mentioned on October 13, 2022. Rivera stated they had not, but he would let the UC know when they did. The UC and Rivera agreed to meet on October 17, 2022, for the UC to purchase the previously discussed/possessed "ghost gun."

7

18. On October 17, 2022, the UC and the CI communicated with Rivera via text messages. Rivera agreed to sell the "ghost gun" and negotiated a price of $850.00 and attempted again to have the UC purchase the Glock, model 20. Rivera lowered his price for the Glock, model 20, to $1,600.00, but again the UC refused to pay that price. The UC and Rivera agreed to meet later on this same day to conduct the transaction for the "ghost gun." Prior to the transaction occurring, Rivera sent the CI a photo of an AR and asked if the CI wanted to purchase it.

19. Later on this same date the UC met with Rivera and CABRERA in the McDonald's parking lot, 110 Hanes Mall Circle, Winston Salem, North Carolina. When Rivera and CABRERA arrived, the UC exited the UCV and contacted them through the passenger-side window of their vehicle. The UC observed CABRERA holding the "ghost gun" and Rivera brandishing the Glock, model 20. The UC reiterated to Rivera that he could not make a profit on the Glock, model 20, at their asking price. CABRERA handed the UC the "ghost gun," which the UC then placed in the UCV. The UC paid CABRERA what he thought was $860.00; however, the UC accidentally shorted him $100.00. Rivera asked the UC what he thought about the AR that he had sent a picture of to the CI. The UC asked if the firearm was fully automatic. Rivera responded that they had not acquired that one yet. Rivera asked

what the highest price the UC would pay for the AR in the picture and the UC asked if it was a 5.56 caliber. CABRERA acknowledged that he thought it was and showed the UC a photo on his phone of the same firearm Rivera had texted the CI about. The UC stated he might be willing to pay $1,400.00 for the firearm and CABRERA asked what is the highest he would pay. The UC reiterated $1,400.00.

20. Prior to separating, Rivera told the UC that he and CABRERA were acquiring three (3) Glock pistols on October 21, 2022. Rivera stated they would be a model 23, model 27, and CABRERA interjected and stated a model 45. The UC told them to let him know if they acquired them.

21. This transaction was audio/video recorded and the funds used for the purchase were prerecorded.

22. On October 21, 2022, Rivera contacted the UC and the CI independently, attempting to sell an "Uzi" for $2,300.00. Rivera also asked the UC, "You interested in a 45?" The UC told Rivera $2,300.00 was out of his price range. The UC asked Rivera if they had acquired the aforementioned three (3) Glock pistols or the AR. Rivera replied, "The ARP? If you not tryna pay 2300 my guy you not gon pay for the ARP trust me...That ARP for 4mags and a shell catcher...Fully auto." The UC stated he would be interested in purchasing the fully automatic ARP, to which Rivera

9

replied, "It's mine gang I jus don't want to keep putting my prices down I rather keep my blowers."

23. On October 22, 2022, Rivera contacted the UC and stated, "Glock with switch on me…Full auto…45" and stated the price was $2,300.00. Rivera also sent the UC photographs of the firearm which clearly depicted a Glock pistol with what appeared to be an affixed machinegun conversion kit, a "Glock switch." The UC and Rivera agreed to meet on October 24, 2022, to conduct the transaction.

24. On October 24, 2022, the UC initiated a text message conversation with Rivera to confirm the planned transaction. Rivera notified the UC that the Glock with affixed switch had stopped firing and needed a new firing pin. In response, Rivera stated he would drop the price to $2,000.00. Rivera also sent the UC a photograph of what appeared to be a "ghost gun" and asked if the UC liked it. Rivera confirmed it was a "ghost gun" and stated, "2000 is jus the firing pin for the 45 with switch and the ghost 19 1500." The UC and Rivera eventually agreed upon a price of $3,200.00 for both firearms and agreed to meet later this same date. Prior to the transaction, Rivera sent the UC another photograph, this one of an ARP; however, the UC stated he would not have enough money to purchase it at this time.

10

25. Later on this same day the UC and another ATF Special Agent (hereinafter, UC2), acting in an undercover capacity, traveled to the McDonald's parking lot, located at 110 Hanes Mall Circle, Winston Salem, North Carolina, to complete the purchase. After waiting a few minutes, Rivera, Correa, and CABRERA arrived, riding in the same vehicle from the previous three transactions, driven by Rivera.

26. When the UCs went to the passenger-side window, they observed Rivera brandishing the Glock, model 20, CABRERA was in possession of the "ghost gun," and Correa was in the rear-passenger seat holding the Glock, model 21, .45 caliber pistol with affixed "Glock switch." Prior to discussing the firearms, the UC paid CABRERA the $100.00 he had accidentally shorted him on October 17, 2022. CABRERA then handed the UC the "ghost gun" and CABRERA stated, "that bitch hot…we just shot it." It should be noted, the UC1 could feel the firearm was warm as if it had recently been fired. Rivera at the same time stated he wanted to show the UC something. Rivera retrieved his phone and showed the UCs a video of what appeared to be CABRERA firing the "ghost gun" out of the vehicle.

27. Rivera then motioned to Correa and told the UCs that he had the "45." UC1 asked to inspect the firearm, to which Correa complied. UC1 asked Correa if the firearm goes "all the way," (meaning was it fully

11

automatic) to which Correa replied "hell yeah" at the same time Rivera acknowledged in the affirmative. UC1 questioned if the only thing he would need to do to make the firearm fully automatic was to replace the firing pin. Rivera and Correa confirmed that UC1 was correct. Rivera stated when "we" purchased it, the individuals they had purchased it from had fired it the day prior. Correa stated the firearm was "clean."

28. UC1 asked Rivera, CABRERA, and Correa if they had the ability to acquire ARPs that were fully automatic and all three (3) answered in the affirmative. Correa stated the group acquires firearms from Charlotte and Rivera stated they were attempting to acquire an FN "P90" and a Scar rifle. The UC handed Rivera $3,200.00 to complete the transaction for the Glock with affixed switch and "ghost gun." While the group continued to engage in conversation regarding firearms, Rivera handed CABRERA approximately $1,000.00 and stated it was for the "ghost." Correa informed UC1 that he was "going to have a nice ass ARP." UC1 asked Rivera which firearm he had in his possession, even though recognized it as the same Glock, model 20. Rivera handed the firearm to CABRERA and stated "we" are thinking about keeping it. Correa then asked UC2 if he "fuck with P90s and Scars", which UC2 answered in the affirmative. Correa again referenced their source of

12

supply in Charlotte and Rivera said they should be acquiring more on October 28, 2022.

29. This transaction was audio/video recorded and the funds used for the purchase were prerecorded.

30. On this same date, after the transaction, Rivera sent UC1 multiple pictures depicting two (2) different ARPs.

31. From the October 24, 2022, transaction to November 8, 2022, Rivera consistently attempted to get the UC and the CI to purchase additional firearms, which they declined.

32. In total, Rivera, Correa, and CABRERA sold, attempted to sell, negotiated to sell, sent pictures of, or otherwise discussed acquiring to sell the following firearms between October 11, 2022 and November 8, 2022; Glock, model 43x; Glock, model 22; Canik, full-auto AR; PMF/"Ghost gun;" Glock, model 20; AR; AR; "Uzi;" Assault Rifle Pistol (ARP); Glock, model 21 with affixed switch; PMF/"Ghost gun;" ARP; AR; FN P90; Scar; AR; Glock; Glock; ARP; ARP; Glock, model 43x; and Glock, model 43x.

33. Since November 8, 2022, and continuing to January 9, 2023, Rivera communicated with the UC regarding firearms for sale. Rivera and the UC eventually agreed to conduct a transaction for two (2) Glock, model 43 pistols and an ARP, for a total price of $4,000.00. On January 9, 2023, the UC and

13

Rivera agreed to meet in the McDonald's parking lot, located at 110 Hanes Mall, Winston Salem, North Carolina.

34. After the UC arrived, the UC observed a vehicle, driven by a female, Rivera was seated in the front seat and CABRERA was seated in the rear passenger seat. The UC made contact with CABRERA and observed CABRERA possessed what he described as a Glock, model 43, and what the UC recognized as an ARP. CABRERA provided both firearms to the UC. The UC then provided a verbal arrest signal to fellow officers. Rivera and CABRERA were both arrested by ATF Agents at that time. CABRERA attempted to flee from agents twice and resisted arrest. It should be noted, Rivera was arrested pursuant to an active federal arrest warrant, under case number 1:22MJ482, issued out of the Middle District of North Carolina on December 8, 2022.

35. This interaction was audio/video recorded.

## CONCLUSION

36. Based on the foregoing facts and circumstances, I respectfully submit that there is probable cause to believe that from October 13, 2022, through January 9, 2023, within the Middle District of North Carolina, GIBRAN CABRERA committed the following criminal offense: did willfully

14

engage in the business of dealing in firearms, in violation of Title 18, United States Code, Sections 922(a)(1)(A), 923(a), 924(a)(1)(D), and 2.

/S/ RUSSELL JOHNSON
Russell Johnson, Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Dated: January 10, 2023.

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit.

Honorable Joi E. Peake
United States Magistrate Judge
Middle District of North Carolina
